Shelley Jean HEYER, Appellant,

v.

Richard Romaine PETERSON, Appellee.

No. 65273.

Supreme Court of Iowa.

June 17, 1981.

Rehearing Denied July 9, 1981.

Joseph L. Fitzgibbons, of Fitzgibbons Brothers, Estherville, for appellant.

Lynn Fillenwarth, of Fillenwarth & Fillenwarth, Estherville, for appellee.

ALLBEE, Justice.

In this appeal unwed parents are vying for the custody of their child. We affirm trial court's award of custody to the father.

I. *Factual background.* The dispute over custody arrives here from this background. The child, Matthew, was conceived as a result of the liaison between Shelley Jean Heyer and Richard Romaine Peterson. This transpired during the summer of 1976, when Shelley was seventeen and Richard was twenty-one. At that time, Shelley was ready to start her senior year at Estherville High School and Richard, who was graduated from the same school in 1973, was employed as a laborer at a packing plant in Estherville. When it was realized that Shelley was pregnant, her parents sent her to Sioux City for foster home care under the auspices of Catholic Charities. Richard regularly visited Shelley in Sioux City, and wanted to marry her.

Matthew was born on April 23, 1977. Shelley then returned home, but the baby remained in a foster home in Sioux City for approximately two months. During this interim, Shelley and Richard frequently visited Matthew together. Richard continued to propose marriage, and his parents approved. Shelley's parents, however, were adamant in their opposition to a marriage, and they urged that Shelley and Richard allow the baby to be adopted; they were of the opinion that Shelley's and Richard's relationship was not likely to endure and that it was in Matthew's interests that he be placed with Catholic Charities for adoption. Shelley's parents also refused to permit her to return to their home with the baby.

Shelley and Richard finally reached the decision to keep Matthew. In July 1977, they took Matthew to the home of Richard's parents, where they resided for about one month. Thereafter, until October 1978, Shelley and Richard, with Matthew, lived in a rural Estherville home that Richard owned. Richard continued at his same employment, and Shelley remained in the home. Richard's parents maintained a close and supportive relationship with the couple and child; conversely, during much of this period, Shelley, Richard and the baby were ostracized by Shelley's parents.

In October 1978, however, Shelley's parents permitted Shelley and the child to move into their home in Estherville, where they remained until January 1979, when they moved to an apartment owned by Shelley's father. Although separated from Shelley and Matthew, Richard visited them as often as could be arranged. His visits were limited while they were in Shelley's parents' home, apparently because of her parents' animosity toward him. Following the move to the apartment, relations between Shelley and Richard improved, and Richard's visitations with Matthew became frequent, often daily. There were occasions when Richard stayed with Matthew, and other times when Matthew visited or stayed at Richard's residence. Shelley, Richard and Matthew even vacationed together in Virginia in the summer of 1979.

II. *Procedural background.* A petition to establish paternity was filed in Shelley's behalf on April 9, 1979, alleging that Richard is Matthew's father and is capable of supporting him. The action was initiated by the Child Support Recovery Unit of the Department of Social Services, the agency to which Shelley had assigned her support payments.[1] Richard neither appeared nor filed a motion or answer in response to the original notice served on him, and on May 21 judgment was entered against him. The judgment was entered on a department form entitled "Enrolled Order." That form provided blanks for the addition of data germane to the case in which it was being utilized. Typed into those blanks in this case were the names of the parties and the child and the child's date and place of birth. A single paragraph of the form also provided "[t]hat Plaintiff shall have custody of the child named above." The district judge to whom the proposed judgment was presented apparently added only the date and the amount of monthly child support to be paid, and affixed his signature. Both the petition and the judgment, or so-called enrolled order, denominate the cause as a law action. The caption of the original notice, however, while bearing the same case number as the other items, indicates the action as being in equity.

In September 1979, upon discovering that the judgment in the paternity action purported to award the custody of Matthew to Shelley, Richard filed a petition pursuant to Iowa R.Civ.P. 252(b) to modify the judgment by expunging from it the provision fixing custody. Richard's petition was filed in the original paternity action, in accordance with Iowa R.Civ.P. 253(a). In the petition, Richard alleged that he had allowed the entry of the default judgment because he admits he is Matthew's father and because he recognizes his obligation to help support the child. He further asserted there was neither an allegation nor any notice that custody would be adjudicated in the proceeding. Finally, he alleged that the provision of the judgment awarding the custody of Matthew to Shelley was procured by irregularity or fraud and in violation of his right to due process of the law.

During this same month, Shelley commenced a dissolution of marriage action. Her petition alleged that in 1977 she and Richard entered into a common law marriage, and she asked that it be dissolved. In addition to petitioning for an equitable division of marital property and the allowance of maintenance, she asked for the sole custody of Matthew.

The two foregoing actions were subsequently assigned to be tried together. On the day of trial, however, the parties stipulated that no common law marriage existed, and settled all the issues raised in Shelley's dissolution action with the exception of custody of Matthew. This accomplished, trial to the court proceeded on Richard's petition to modify the judgment in the paternity action; the dissolution action was thereafter dismissed. By agreement of the parties, two issues remained to be determined: first, whether custody was validly adjudicated in the underlying paternity action, and second, in whose custody Matthew's interests would best be served. In its findings and conclusions filed on June 9, 1980, trial court held the custody award provision of the paternity action judgment was void, and determined that Matthew should be placed in Richard's custody.

On appeal, Shelley asserts that trial court was mistaken in these respects: (1) in modifying the paternity action judgment by voiding the custody award; (2) in failing to require that Richard demonstrate a superior claim of right of custody; (3) in failing to demand that Richard establish a material change of circumstances to justify a change in custody; and (4) in not awarding her custody of the child.

III. *Scope of review.* From the outset, trial court and the parties have treated the underlying paternity proceeding as an ac-

---

1. *See generally* ch. 252B, The Code 1979, pertaining to the establishment and services of the Child Support Recovery Unit.

tion at law, controlled by chapter 675, The Code 1979.[2] The source of this controversy, of course, is Richard's petition to modify the judgment in the paternity suit. As previously noted, both the petition to establish paternity and the judgment entered in that action were captioned at law. Similarly, Shelley's notice of appeal in the instant case is also styled as at law. Only the original notice of commencement of the paternity action, a partially completed form which bore a blank for an equity number to be inserted, indicates the cause as being equitable. Significantly, trial court applied chapter 675 provisions to its findings and conclusions, relying specifically on section 675.31 for jurisdiction to determine the custody of the child.[3]

■ Appellate review is generally governed by the mode in which the case is tried. *E. g., Atlantic Veneer Corp. v. Sears,* 232 N.W.2d 499, 502 (Iowa 1975); *Mosebach v. Blythe,* 282 N.W.2d 755, 758 (Iowa Ct. App. 1979). More conclusive of the nature of our review here, however, is the fact that paternity cases under chapter 675 are to be conducted "as in other civil cases." § 675.18. Our review is thus only upon assigned error, not de novo. *Moen v. McNamara,* 272 N.W.2d 438, 439 (Iowa 1978).

This consideration of the scope of our review is necessary due to the contrast between a chapter 675 action and a proceeding under chapter 252A, The Code 1979.[4] The latter chapter, which provides a vehicle for obtaining support for dependents from persons who are legally responsible, § 252A.1; *see Stearns v. Kean,* 303 N.W.2d 408, 412 (Iowa 1981), has been interpreted to create a special proceeding triable in equity and in which paternity may also be determined. *Greenstreet v. Clark,* 239 N.W.2d 143, 147–49 (Iowa 1976).

IV. *Issues presented for review.*

**A.** *Propriety of award of custody in proceedings to establish paternity.* Shelley first contends trial court erred in modifying the paternity action judgment by voiding the custody award. Trial court concluded the petition and original notice failed to notify Richard that custody would be settled in the paternity proceeding.

Initially, we note that Iowa R.Civ.P. 235, applicable here, states:

The [default] judgment may award any relief consistent with the petition and embraced in its issues; but unless the defaulting party has appeared, it cannot exceed what is demanded against him in the petition as limited by the original notice.

Scrutiny of the petition to establish paternity reveals that it embraces only allegations material to establishing Richard's paternity and his ability to provide support for Matthew and for expenses related to Matthew's birth. Correspondingly significant is what was not alleged in the petition. Notably, it lacks any reference to custody of the child. There is no allegation that Matthew's interests demanded that Shelley be awarded custody; nor is there any allegation that the child's legal custody should be established.

■ This court has long held that relief granted in a judgment by default, as was done here, must be consistent with the case made by the petition. *See Claeys v. Moldenschardt,* 169 N.W.2d 885, 886 (Iowa 1969); *Rayburn v. Maher,* 227 Iowa 274, 285–87, 288 N.W. 136, 141–42 (1939); *accord, Walters v. Williams,* 203 N.W.2d 383, 386 (Iowa 1973). As the *Rayburn* court explained,

[i]t is true, that when a defendant defaults, the plaintiff becomes entitled to certain advantages. But such failure by the defendant does not enlarge his claim nor broaden his rights under the allegations of his petition. His right of recov-

---

**2.** Chapter 675—Paternity of Children and Obligation of Parents Thereto.

**3.** Relevant to trial court's determination and our further deliberations, section 675.31, The Code 1979, provides: "The court has continuing jurisdiction over proceedings brought to compel support . . ., *and also has continuing jurisdiction to determine the custody in accordance with the interests of the child."* (Emphasis added.)

**4.** Chapter 252A—Uniform Support of Dependents Law.

ery and the amount and nature thereof is still limited by those averments. Though a defendant may default, he is still within the pale of the law and is entitled to just treatment. He has a right to expect and to demand that plaintiff's recovery shall be confined, and responsive, to his pleaded demand.

227 Iowa at 285, 288 N.W. at 141. This principle remains applicable today, except in cases where the defendant has appeared. *See* 3 Iowa Rules Civ.Proc.Ann., rule 235 (West 1970) (comment on rule 235). As stated previously, in this case Richard never appeared in the underlying paternity suit, ostensibly for the reasons set forth in his petition to modify the judgment entered in that action. We add parenthetically that at trial Richard testified he chose not to appear or defend in the proceeding to establish paternity "because it was a hearing to declare whether I was the father of Matthew or not, and I did not show up because I was not denying the fact that I was." Certainly, the *allegations* of the paternity petition failed to notify Richard that custody would be adjudicated in that proceeding.

Shelley nonetheless insists that the *prayer* of the petition is sufficient to have alerted Richard that custody was an issue to be determined. That prayer requested the following:

> WHEREFORE, Plaintiff prays that the Defendant be legally and judicially established as the father of said child(ren); that Defendant be required to support and care for said child(ren) until said child(ren) reaches the age of 18 years of age, and that Defendant be required to pay the hospital, doctor, medical and other expenses incidental to the confinement of said Plaintiff and birth of said child(ren) and be given such other and further general relief as to the Court may seem just and proper in the premises.

As support for her contention, Shelley specifically relies on that part of the final sentence which reads: "and be given such other and further general relief as to the Court may seem just and proper in the premises." For several reasons, we are unable to agree with her contention.

First, there is the obvious lack of any reference to custody *per se* in either the petition's allegations or prayer.

Moreover, even in circumstances where our review is de novo and a prayer "for other relief as is just" is liberally construed, a grant of relief in addition to that specifically asked must fairly conform to the case made by the pleadings and the proof. *See, e. g., Anderson v. Yearous,* 249 N.W.2d 855, 859 (Iowa 1977). Even if our review in this case were de novo, it is difficult to envision the matter of custody as being embraced within the relief allowable under the petition.

Furthermore, it is our view that the adjudication of custody is not a usual or necessary incident of a chapter 675 action to establish paternity and secure support. The fact that section 675.31 declares that the court "has continuing jurisdiction to determine custody ..." means to us that the determination of custody is an independent and subsequent step and is not inherent in the proceeding to establish paternity. Our view is confirmed by the legislature's recent action clarifying this very question. By amendment to chapter 675, effective January 1, 1981, 1980 Sess., 68th G.A., ch. 1186, § 2, new section 675.40 provides:

> The mother of a child born out of wedlock whose paternity has not been acknowledged and who has not been adopted has sole custody of the child unless the court orders otherwise. *If a judgment of paternity is entered, the father may petition for rights of visitation or custody in an equity proceeding separate from any action to establish paternity.*

§ 675.40, The Code 1981 (emphasis added).

Finally, we observe that the portion of the prayer's final sentence upon which Shelley relies is confusing and ambiguous. It is not consistent with the series of dependent clauses preceding it. Rather than being a dependent clause, it is merely a dangling phrase, lacking a subject of its own. Moreover, on perusal one is led to believe the defendant is the person who should be given further general relief. Hence, we are

convinced that it was more likely to confuse rather than inform Richard as to the relief allowable under the petition.

Shelley also argues that because an admonition appended at the bottom of the original notice which Richard received advised that an attorney should be informed of the notice, Richard's failure either to do so or to seek any legal advice should preclude him from attacking the default judgment due to his lack of respect for the judicial process. That argument is untenable in this case.

Lastly, Shelley contends that "[i]n examining the demand in the petition to establish paternity, which prays for any relief the court deems proper, it is abundantly clear that the award of child custody did in fact meet the demand for relief requirements of [Iowa R.Civ.P.] 69 . . . ." For the reasons enunciated above, we are unable to subscribe to this argument. Certainly with respect to custody, fair notice was not given here. See Gosha v. Woller, 288 N.W.2d 329, 331 (Iowa 1980) (trial court's judgment founded on theory not pleaded; fair notice requirements of rule 69(a) held not satisfied).

Thus, we agree with trial court that the petition failed to reasonably inform Richard that custody was to be, or even could be, dealt with in the proceeding to establish paternity. We further conclude that the award of custody in the judgment by default entered on the petition to establish paternity was not consistent with the petition and embraced in its issues, and that the award in fact exceeded that which was demanded in the petition. Trial court therefore did not err in modifying the default judgment by voiding its provision awarding custody of Matthew to Shelley based upon irregularity in obtaining that award.

B. *Whether Richard should have been required to demonstrate a superior claim of right of custody.* Before addressing this

and the ensuing issues, we again note that it was agreed between trial court and the parties that, pursuant to the parties' stipulation which disposed of Shelley's dissolution of marriage action, Matthew's custody was to be resolved in this case.

Shelley asserts that as between the unmarried parents of a child born out of wedlock, the father should be required to "show a superior claim" of right of custody. For support, she cites *Pratt v. Nitz*, 48 Iowa 33 (1878). Shelley contends that *Pratt* holds "that custody of an illegitimate child should remain with his mother absent [a] showing that the father [is] of a higher moral character than the mother or that the mother abused the child." We believe, however, that Shelley misunderstands *Pratt*.

In *Pratt*, the putative father, after having contested and lost the proceeding to establish his paternity, *State v. Pratt*, 40 Iowa 631 (1875), sought to gain custody of the child from the mother on the ground that she was not a proper person to have custody due to her "lewd, vicious and brutal habits and conduct." The mother, in turn, characterized the father as a "lewd, vicious and immoral person," unfit for custody. The crux of the *Pratt* court's determination is conveyed by this paragraph:

> There is no evidence tending to show that the plaintiff is a proper person to have the custody and control of the child. On the other hand, there is much in the case that leads the mind to an opposite conclusion. His moral character is no better than that of defendant.

48 Iowa at 35. The final sentence of the quoted paragraph, from which Shelley apparently has drawn her latter contention, is simply a conclusion based upon a comparison of the litigants in that case, and nothing more. It is not an announcement of a moral standard for testing a putative father's qualifications for custody against those of the child's mother.[5]

5. We of course do not denigrate the importance of moral character as a consideration in the selection of a custodial parent; it is, however, but one of several factors ordinarily to be taken

into account in reaching a custody resolution. *Cf. In re Marriage of Dawson*, 214 N.W.2d 131, 132 (Iowa 1974) (in dissolution action, moral

*Pratt* aside, we observe that Shelley has not referred to any statutory provision which favors the natural mother over the father when the issue of custody as between unwed parents arises. Certainly no preference is set forth in chapter 675, The Code 1979. Nor does Shelley raise any constitutional basis in support of her contention that the father must demonstrate a superior right of custody. Furthermore, we find no authority within our Iowa jurisprudence for any gender-based discrimination in the selection of a custodial parent as between unwed parents. *Cf. In re Marriage of Bowen*, 219 N.W.2d 683, 688 (Iowa 1974) (in marriage dissolution, the inference that the best interests of young children are served if custody is awarded to their mother instead of their father is not justified and hence abandoned). *But see Pitzenberger v. Schnack*, 215 Iowa 466, 469, 245 N.W. 713, 714 (1932) (mother of illegitimate child is entitled to custody vis-a-vis third parties absent showing of abandonment).

■ When the issue of custody arises from the competing claims of unwed parents, we do not believe the critical issue to be which parent possesses the greater right to the child. Rather, we conclude that in a custody contest of this nature, the controlling consideration must be the interests of the child. *See* § 675.31, The Code 1979 (The court has continuing jurisdiction "to determine . . . custody *in accordance with the interests of the child*.") (emphasis added). This profound decision involves selecting as the custodial parent the person who can minister more effectively to the long-range best interests of the child. The objective ought always to be to place the child in the environment most likely to bring that child to healthy physical, mental and social maturity.[6]

Trial court properly premised its custody ruling upon only Matthew's interests.

C. *Whether Richard should have been required to establish a material change of circumstances to justify a change of custody.* Because she was awarded custody of Matthew in the default judgment entered in the paternity proceeding, Shelley contends trial court erred in not requiring that Richard demonstrate a material change of circumstances in order to justify a change of custody. In light of our previous conclusion, however, this argument is without merit. Because the custody award made in the default judgment was a nullity, trial court did not err in treating the custody question as an issue for original determination.

D. *Propriety of the award of custody to Richard.* The final issue concerns the propriety of trial court's decision to award custody of Matthew to Richard. Because this issue is equitable in nature, and was tried as such, our review is *de novo*. This is true even though the previous issues presented legal questions and were therefore reviewed for correction of errors at law. *See Atlantic Veneer Corp. v. Sears*, 232 N.W.2d 499, 502 (Iowa 1975).

■ In our review, while we accord weight to trial court's findings of fact, especially when considering the credibility of the witnesses whom that court heard and observed firsthand, we are not bound by those findings. Iowa R.App.P. 14(f)(7). Matthew's best interests are, of course, central to our consideration. Iowa R.App.P. 14(f)(15). *See also* § 675.31, The Code 1979. In our determination, we shall be guided by the criteria for child custody adjudication delineated in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), which are to be weighed together in reaching any custody decision. *In re Marriage of Mikelson*, 299 N.W.2d 670, 674 (Iowa 1980). We believe the criteria for determining custody should be the same whether the parents are dissolving their marriage or are unwed.

---

misconduct is a factor in determining fitness for custody of minor children).

**6.** Unfortunately, "[d]etermining what custodial arrangement will best serve the long-range interest of a child frequently becomes a matter of

choosing the least detrimental available alternative for safeguarding the child's growth and development." *In re Marriage of Winter*, 223 N.W.2d 165, 167 (Iowa 1974).

Having examined the entire record and inspected trial court's findings, we conclude that trial court's own reasoning is persuasive of the propriety of its custody determination. We thus set forth a portion of those findings pertaining to that determination.

Matthew is presently age three. There is no evidence that he is anything but normal as to his maturity and mental and physical health. There is evidence, however, that other factors may be lacking in Matthew's upbringing. His material needs apparently are being met by contributions from both of his parents; however, discipline by the mother and participation in activities with Matthew by her seem to be lacking when compared to the needs supplied by his father in these areas.

Shelley Heyer appears to the Court to be, at this time, more concerned with pursuing and fulfilling her needs than those of her son. The Court is well aware of the problems of being a young single parent and balancing personal needs with those of a very young child. The Court is also aware that the father, Richard Peterson, is older, is accustomed to working and providing a living for himself and that he has not always willingly provided the necessary support for Matthew. The Court is further aware that the problems of being a full-time parent have rested more with Shelley than they have with Richard and that this factor alone may emphasize in Shelley's mind the need to have some freedom from her responsibilities as the custodial parent.

Both Shelley and Richard appear to be in approximately the same position as far as their ability to spend time with Matthew is concerned. Shelley is presently working and undoubtedly Richard will be shortly. This factor alone will necessitate leaving Matthew with someone else during the normal working period. Because Shelley has had the physical custody of Matthew since the separation of the parties, Richard's time with Matthew has been through visitation; however, the record is very positive towards Richard in this respect. Shelley, on the other hand, has obviously spent considerable time away from Matthew in addition to the time she is employed.

Richard seems to be the more stable of the two parents. This, of course, may be due to his advanced age and his reliance upon his own abilities to earn a living. But, nonetheless, he evidences to this Court more stability and understanding of the needs of Matthew than does Shelley.

. . . .

Some complaint is made by [Shelley] that custody of Matthew with Richard would be disruptive because of his announced plans to move to Vernal, Utah; and to a certain extent, this is true. On the other hand, the Court has no assurance of Matthew's future whereabouts if custody is placed with Shelley. Admittedly, she is presently residing in Estherville in a house provided by her father and is employed at the Iowa Lakes Community College. This situation gives some immediate stability to Matthew's whereabouts. However, Shelley is young and attractive and presently going with a man who either is or aspires to be a professional skier. Prior to her association with this man, she dated other men and, undoubtedly, will continue to do so if her present relationship terminates. Shelley is just as mobile as Richard. She has no more roots in the city of Estherville than he does. The Court feels that her present situation lends little color to her argument that custody in Richard would be more disruptive than custody in her.

The Court must acknowledge that the custody question between Shelley and Richard is very close, certainly not an obvious choice for the Court. All factors considered, the Court feels Richard to be the more stable, mature and concerned parent. He is less concerned about himself than Matthew. He has demonstrated his willingness to spend time with the boy, recreationally, socially and personal-

ly, and he seems to understand that a child needs both love and requires discipline as well as consistency and attention to all his varied needs. Richard is not without some faults, but hopefully he will, as a single parent, care for and attend to Matthew's needs as the Court believes he can.

Trial court also commented that it had taken into account all of the *Winter* criteria even though it did not refer to each in its discussion.

■ On the whole record, we agree that Richard is the parent who "can minister more effectively to the long-range interests" of Matthew. *See Winter*, 223 N.W.2d at 166. Overall, Richard has demonstrated the greater concern for Matthew's welfare; the evidence reflects that Richard is the more mature and stable of the two parents; Richard has been the better and more consistent disciplinarian; he is able to provide for Matthew's physical, mental and social needs; Richard and Matthew also relate well to one another.

We have not overlooked Richard's shortcomings as revealed by the record. Nor is our decision to be construed as a condemnation of Shelley. The past actions of both amply demonstrate the love and concern they each have for Matthew. Furthermore, each is fit to be the custodial parent. Our responsibility, nonetheless, is to determine which parent we believe will better serve Matthew's long-range interests.

AFFIRMED.

All justices concur except HARRIS, J., who dissents, UHLENHOPP and McCORMICK, JJ., who join this dissent, and McGIVERIN, J., who dissents.

HARRIS, Justice (dissenting).

I respectfully dissent because I am persuaded that the child's best interests would be served by placement with his mother rather than his father. A common denominator, one which makes the question of placement a painful one, is the immaturity of each parent.

The majority has wisely chosen to not dwell on respective ingredients of each party's shortcomings. It is ample to state that their past lifestyles demonstrate a lack of the stability which Matthew needs and deserves. Richard has shown a cavalier attitude toward any career. He admitted a poor work record and was unemployed at the time of trial. His social habits were at complete odds with those expected of a father and family man. Shelley's social habits were depressingly similar. She seemed, as the trial court observed, self-centered. Her past dedication to parental responsibility was varied.

It seems that the clergyman who declined to officiate a marriage of the two on the basis of their immaturity acted with justification. Looking to their shortcomings at the time of hearing there is more than enough cause for disappointment in both parents. For two reasons, however, I think the record shows that Shelley is much more likely than Richard to grow in maturity and thereby provide Matthew with the stable environment he needs.

For one thing Shelley, more than Richard, can blame her age for her past immature conduct. Four years Richard's junior, she was herself little more than a child when she undertook her relationship with Richard. Shelley's parents' objections to Richard were based as much on his age as on his lifestyle. To whatever extent maturity can be expected to occur with experience and the passage of time, Shelley has four important years of opportunity to grow. Richard has a correspondingly lesser likelihood to mature. To the same extent it must be assumed Richard has selected his lifestyle.

The record also indicates that Shelley is much more likely to find and exploit opportunities for self-improvement. Whatever her shortcomings, she has reached out for direction and instruction from her church, its institutions, even from Richard's mother. Rather than choosing to remain locked in to the inadequacies which might seem inevitable from being a "child mother" she seems to have chosen to exploit her opportunities

to improve her parenting skills. The record indicates she has far more opportunities than Richard has to exploit.

My reading of the record leads me to believe that Shelley can offer Matthew the more desirable and stable future. I would award Matthew's custody to her.

UHLENHOPP and McCORMICK, JJ., join this dissent.

McGIVERIN, Justice (dissenting).

I respectfully dissent from division IV and the result. I conclude that custody was validly established in the paternity proceeding and should not have been awarded to Richard, absent a material change in circumstances.

The petition filed on behalf of Shelley sought to establish Richard's paternity of Matthew, and Richard's obligation for support and expenses of birth. The prayer also asked for "such other and further general relief as ... may seem just and proper." Richard did not appear and therefore a default judgment, including an award of custody to Shelley, was entered. The court had jurisdiction in the paternity proceeding to determine custody. § 675.31, The Code.

Under Iowa R.Civ.P. 235, I believe the award of custody to Shelley was "consistent with the petition and embraced in its issues." Unlike the majority, I do not find it "difficult to envision the matter of custody" being raised by the petition. If only paternity and support were adjudicated, a crucial void would be left. Without a determination of custody, who should have charge of Matthew? Under notice pleading, we should not penalize Shelley because Richard did not show enough interest in the case to take steps to determine whether "general relief" included an award of custody. Therefore the court erred in modifying the judgment by voiding the custody award.

Since I conclude that Shelley was validly awarded custody in the paternity proceeding, Richard should not be awarded custody absent a change in circumstances. Finding no change in circumstances, I would leave custody of Matthew with Shelley.

I would reverse.